IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JUDY CROUCH, CHERYL HUFF, ERIC           )
THREADGILL, REBECCA BLACKBURN,           )
SHAUNA HENSLEY, PAT PLASKETT,            )
PATTY MASON, ELONDA LAYNE, LISA          )
JOHNSON, ANTHONY QUINN, JENNIFER         )
FRALE, BRANDY ROHWEDER, SHERRY           )
ABSTON, JOYCE BARNARD, VICKI BEATY,      )
ZORA BOSWELL, MICHAEL CONATSER,          )
SANDY CONATSER, SHELIA EMBERTON,         )
JAMMIE GOFF, TAMMY LIPSCOMB, LARRY       )
MCDONALD, REBECCA MILLER, LINDA          )
NASH, NANCY NEXBITT, RICHARD PHILLIPS,   )
MARY REAGAN, RICHARD REAGAN, GINA        )
RODDY, LAKEISHA SANDERS, KAREN           )
STAFFORD, MARTI STAFFORD, JANICE TRENT,  )
MARY WALKER and FELISA WRIGHT            )
on behalf of themselves and all others   )
similarly situated,                      )
                                         )
         Plaintiffs,                     )
                                         )
v.                                       )   Civil Action No. 3:07-cv-00541
                                         )
GUARDIAN ANGEL NURSING, INC., a Tennessee )  Judge Thomas A. Wiseman, Jr.
corporation; GUARDIAN ANGEL NURSING, INC., )
a Mississippi corporation; ON-CALL STAFFING )
OF TENNESSEE, INC. d/b/a LEAWOOD, INC.;   )
ON-CALL STAFFING, INC. d/b/a LEAWOOD, INC.;)
LEAWOOD, INC.; QUALITY CARE HOME          )
HEALTH AGENCY, INC., a Tennessee          )
corporation; E.L. "Lee" GARNER, JR., and  )
E.L. "Lee" GARNER, III,                   )
                                         )
         Defendants.                     )


<u>MEMORANDUM OPINION – PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT</u>

        In this action, the named Plaintiffs, all licensed practical nurses ("LPNs"), on behalf of themselves

and others similarly situated,[1] seek recovery under the Fair Labor Standards Act for overtime pay and

liquidated damages, among other relief.  (See Am. Compl., Doc. No. 41.)  Presently before the Court are

two motions for partial summary judgment filed by the Plaintiffs.  The first motion (Doc. No. 141) seeks

_____

        [1] Approximately thirty-five plaintiffs were named in the Amended Complaint (Doc. No. 41) filed on
June 27, 2007.  Since then, Plaintiffs' counsel have filed a "Consent to Become a Party Plaintiff" for more
than one hundred additional LPNs.  Plaintiffs' motion to certify a class remains pending, but at this point it
is unclear whether that motion has been rendered moot.

judgment in favor of the Plaintiffs on the issues of (1) whether Plaintiffs are employees of the Defendants rather than independent contractors for purposes of the Fair Labor Standards Act, thereby entitling them to overtime pay; and (2) whether under the joint-enterprise or operational-control theory each Defendant should be considered the Plaintiffs' employer, such that all Defendants will be jointly and severally liable for any damages to which Plaintiffs prove they are entitled. The second motion (Doc. No. 182) seeks judgment in Plaintiffs' favor on the questions of (1) whether Defendants acted without good faith in failing to comply with the Fair Labor Standards Act, such that they will be obligated to pay liquidated damages in addition to any other damages for which they may be liable under the statute; and (2) whether Defendants acted willfully, such that a three-year statute of limitations applies to the Plaintiffs' claims rather than the two-year period that would otherwise be applicable.

For the reasons explained more fully below, the Court finds that: (1) Plaintiffs are employees rather than independent contractors for purposes of the Fair Labor Standards Act; (2) there are no material issues of disputed fact as to whether Defendants Guardian Angel Nursing, Inc., a Tennessee corporation, Guardian Angel Nursing, Inc, a Mississippi corporation, On-Call Staffing of Tennessee, Inc., On-Call Staffing, Inc. and E.L. Garner, Jr. should be held jointly and severally liable in this case, but material issues of fact preclude judgment as a matter of law as to the joint and several liability of the remaining Defendants, namely Lee Garner, III and Quality Care Home Health Agency, Inc. Plaintiffs' first motion for partial summary judgment will therefore be granted in part and denied in part. The Court further finds on the basis of the undisputed evidence that Defendants acted both without good faith and willfully in violating the Fair Labor Standards Act, so the second motion for partial summary judgment will be granted in full.

## I.    FACTUAL BACKGROUND

The facts set forth below are either undisputed or viewed in the light most favorable to the Defendants as the non-moving parties.

### A.    Facts Relevant to First Motion for Summary Judgment

#### 1.    *Overview of Private-Duty Nursing in the Home Health Care Context*

If a patient is unable to care for himself upon release from a hospital or institutional setting, the discharging physician will often prescribe home health care. In Tennessee, home health care is

administered by a licensed home health care agency that has been issued a Certificate of Need ("CON") by the state to operate in a limited area, usually within five to six contiguous counties. Nurse staffing agencies do not have a CON and cannot operate independently of a home health agency to supply nursing care.

Home health care must be administered by a licensed health-care provider. Home health care agencies are on a consecutively revolving registry with hospitals. In a patient's discharge orders, an order for home health care triggers the hospital's discharge nurse to call the home health care agency. Once the home health care agency receives the physician's order, a Registered Nurse ("RN"), usually but not always working for the home health care agency, transfers the physician's order to a "Form 485," which is a document setting forth in detail the plan of medical care for the particular patient. Once the physician signs the Form 485, the patient is eligible to receive home health care. Typically, after home health care has been initiated, an RN performs a "recertification"—that is, she assesses the patient, reformulates or updates the plan of care set forth in the Form 485 as necessary, and presents it to a physician for recertification—every thirty to sixty days.

With the national nursing shortage, many home health care agencies do not have sufficient nursing staff to handle assigned patient loads. Home health care agencies will contract with outside nurse staffing agencies to supply licensed practical nurses ("LPNs") to carry out physicians' orders on the Forms 485, including orders for continuous private-duty nursing care in the home health care agency's patients' homes. In addition, RNs employed by the staffing agencies will often perform the recertification of the Form 485 once home health care has been initiated.

The home health agency bills the patient, or the patient's insurer, for the private-duty nursing care, and receives payment for the private-duty nursing services rendered by the nurse staffing agency LPNs. In turn, the home health agency pays the nurse staffing agency the agreed-upon hourly rate for each hour that the LPNs rendered private-duty nursing to the home health patients. The staffing agency, not the home health agency, then directly pays the LPNs who actually rendered services.

### 2. Defendants' Ownership Structure

Defendants Guardian Angel Nursing, Inc., a Tennessee corporation (formed in 2004); Guardian Angel Nursing, Inc., a Mississippi corporation (formed in 2001); On-Call Staffing, Inc., a Mississippi

corporation; and On-Call Staffing of Tennessee, Inc., a Tennessee corporation (collectively referred to hereinafter as "On-Call," in the singular) are or were nurse staffing agencies that contract with home health agencies to supply them with LPNs to provide private-duty nursing to the home health agencies' patients. Defendants concede that these four entities operate as a single enterprise and that, to the extent any of them is liable, they will all be jointly and severally liable to Plaintiffs.

Quality Home Health Agency, Inc. ("Quality") is a Tennessee corporation formed in 2005. It is not clear whether its stock is owned by On-Call or by Defendant Lee Garner, III. (*Compare* Doc. No. 135-1, 10/25/2007 Deposition of Lee Garner, III (hereinafter, "L. Garner, III Dep.") at 14:1–4 (where Garner agreed that On-Call owns one hundred percent of the stock in Quality), *with* L. Garner, III Dep. 53:23– 54:4 (stating "I know I'm the owner, I thought, but I'm not sure if On-Call's on it. I don't know.").) E.L. Garner, Jr. is the registered agent, president and Chief Executive Officer of Quality. Quality is a licensed home health agency operating under a CON issued by the State of Tennessee. Quality provides home health care and private-duty nursing to patients within Tennessee. Quality employs some LPNs directly, but also contracts with On-Call to supply LPNs to provide private-duty nursing to Quality's patients.

Defendant E.L. Garner, Jr. is the father of Defendant Lee Garner, III. On-Call was founded and initially financed by E.L. Garner, Jr. However, Lee Garner, III is the incorporator, registered agent, president, sole director and primary shareholder of On-Call. Despite holding all those titles, Lee Garner, III testified in his deposition that his father "basically ran the company" (Lee Garner, III Dep. 9:1–2) and that he himself never actually had any dealings with the company, never had any job duties, and did not collect a salary from On-Call until either around June 2006 (*see* L. Garner, III Dep. 53:6–15), or May 31, 2007 (Doc. No. 179-4, 11/12/2007 Aff. of L. Garner, III, at ¶¶ 3–5), when he began managing On-Call's Memphis operations.

E.L. Garner, Jr.'s testimony regarding Lee Garner, III's involvement with On-Call is somewhat contradictory. According to an affidavit executed on March 17, 2008, E.L. Garner, Jr. "exercised operational control over [On-Call] at all times. Decisions regarding financial affairs, compensation practices, and operational control of the companies have always been primarily [his] to make." (Doc. No. 179-5, 3/17/2008 Aff. of E.L. Garner, Jr., at ¶ 3.) In the same document, E.L. Garner, Jr. averred that Lee Garner, III's position with On-Call was that of "title holder in name only," and that Lee Garner, III did not

take any active role or receive any compensation from On-Call until the Spring of 2007, when he began managing On-Call's servicing of the Greater Memphis area. (*Id.* ¶ 4.) However, in a deposition given almost a year earlier, in August 2007, E.L. agreed that Lee Garner, III, as president of On-Call, had the authority and ability to do something about it if he thought the company was out of compliance with the law. (Doc. No. 139-1, 8/24/2007 Dep. of E.L. Garner, Jr. (hereafter, "2007 Garner Dep."), 62:3–17.) He also asserted that when he set up the company in 2001 or 2002, he set it up for his son Lee, and he himself had no role other than to provide free advice. He agreed that Lee Garner, III was "in it day-to-day" from the beginning while he himself was not (*id.* 73:4–9), and that Lee Garner, III was "head of the company" and was in "operational control." (*Id.* 73:25–74:8, 75:2–18.)

### 3. Plaintiffs' Status with On-Call

On-Call is in the business of providing staffing for home health agencies or health care facilities. It is not in the business of providing healthcare to patients. Plaintiffs are all licensed practical nurses who provide (or provided) private duty in-home nursing care to patients in the patients' homes through On-Call. The position held by Plaintiffs requires an LPN license.

Before working for On-Call, LPNs must complete and return application materials contained in a packet (the "Packet") given to them by On-Call. Among other items, the Packet includes documents entitled "Employment Eligibility Verification," "Employee Checklist," "TB Screening" list, "Employment Verification Form," and "Orientation Checklist." The Packet also includes an "Employee Code of Conduct," a drug abuse policy, LPN position description, an authorization for background check, a request for proof of insurance, or alternatively an application for nurse's professional liability insurance, licensure verification form, nursing skills checklist, and Independent Contractor Agreement ("ICA"). Each applicant is required to provide the information requested by the various forms. The applicant is also requested to provide proof of current CPR certification and a copy of her social security card.

On-Call screens LPN applicants to ascertain whether they have a valid LPN license, current TB skin test and CPR certification, and performs a background check for felonies and a reference check in which previous employers are contacted, before an applicant is placed on the "active" list for private-duty nursing assignments. If the LPN does not provide proof of liability insurance, then On-Call will submit an application for insurance on the LPN's behalf and withhold the premium costs from the LPN's paycheck.

After an LPN begins working, On-Call can perform random drug screening on the LPN.

On-Call treats LPNs as independent contractors. The LPNs are, in fact, required to sign the ICA before they received a patient "referral" or "assignment." Defendants have stipulated that each Plaintiff in this action executed an ICA. At least some of the ICAs contain non-competition/non-solicitation clauses that provide in pertinent part that the LPNs are not permitted, during the term of the ICA or for a twelve-month period thereafter, to "(a) directly or indirectly solicit, market, or sell competitive services or products to any Client of [On-Call] to whom Contractor provided services during his/her engagement with [On-Call]; (b) solicit, market, sell competitive services or products to any other Client of [On-Call] of whom Contractor learned while employed by [On-Call]; and/or (c) solicit, directly or indirectly, any of [On-Call's] employees." (Doc. No. 133-1, at ¶ 13; *see* Doc. No. 133-1, at 1–2 ("Contract Analysis" compiled by Plaintiffs indicating which of Plaintiffs' ICAs included a non-competition/non-solicitation covenant).)

The Employee Code of Conduct also contained in the Packet provides, in part, as follows:

Violation of any of the following acts will constitute [sic] disciplinary action and may result in immediate termination.

. . . .

2.      Disobedience or insubordination to supervisors.

. . . .

5.      Documenting your timesheet IN and OUT at times other than those authorized.

6.      Discussing personal problems with patients including, but not limited to discussions of or in regards to personal relationships, feelings or emotions not related to the day-to-day care of the patients.

. . . .

10.      Willful or careless disregard of, or inattention to, working direction and instructions; or refusal to comply with, or violations of these rules, safety or fire regulations or sanitary rules and regulations.

11.      Absence from work without a physician's permit and/or authorization from supervisor.

12.      Failure to obtain permission from your supervisor to leave your job or assigned premises during work hours.

. . . .

14.      Consuming food or beverages at unauthorized times or in unauthorized areas.

. . . .

16.      Unauthorized posting of notices or literature on facility premise[s] or patients[']

residences.

. . . .

18.     Performing personal work on agency time without the express permission of your supervisor and/or administrator.

19.     Using agency or patient phone for personal matters.  Personal telephone calls are to be made only during authorized breaks and lunch periods.  There are to be no long distance phone calls made from a patient[']s home.

20.     Taking more than the specified time for meals or rest periods without the authorization of your supervisor.

. . . .

22.     Discourteou[s] conduct toward any patient, family member, or employee.

. . . .

28.     Leaving assigned duties without notification to and authorization from your supervisor.

29.     Having visitors while on duty without authorization from your supervisor.

. . . .

33.     Sleeping while on duty.

34.     Failure to attend staff meeting, without approval.

. . . .

36.     Failure to obtain employee physical reports when requested by supervisor or Human Resources.

37.     Lounging while on duty.

. . . .

39.     Reporting to work out of uniform [or] dressed inappropriately.

. . . .

41.     Driving patients in your personal vehicle. . . .

42.     Nursing staff is not to pay patient bills or be responsible for patient's [sic] financial affairs.

43.     You are to be present at patients [sic] home during working hours, you may not run errands or leave patient alone. . . .

(Doc. No. 14-2, Employee Code of Conduct at 11–12.)

Plaintiffs are also provided with On-Call's Policy and Procedure Manual (the "Manual").

Defendants insist that the Manual is simply placed in patients' homes pursuant to the requirements of the

home health agencies for which On-Call provides LPNs.  (Doc. No. 179-9, 12/2007 Aff. of C. Casey

("Casey Aff.") ¶ 5.) Defendants, through Christine Casey, former regional coordinator in the human resources department for On-Call, prepared the Manual by purchasing it from a reputable company that provides generic medical forms and manuals. Casey understood, based on that company's representations, that the form manual "contained the basic private duty nursing policies and procedures that reflected current regulations and the accepted standard of care." (*Id.*) She did not change the form manual other than to insert the name "On-Call" into the blanks. (*Id.*) However, Plaintiffs have submitted into evidence a "Welcome" note, given to at least some of the Plaintiff LPNs, that indicates that the Manual is specifically for the LPNs' use and reference. The note states in pertinent part:

> We have outlined in this manual an explanation of policies and procedures that apply to all who work within our company. Please study this manual carefully and keep it for future reference. If there is anything within this manual that you do no[t] understand, please contact the personnel office for assistance.

> Please be aware that we encourage and sustain you in your efforts toward achieving personal growth and the accomplishment of both your personal and career goals as well as the goals of our company. We trust that this manual will help serve this purpose.

(Doc. No. 144-4, at 8.) The note was signed by Lee Garner, III as "CEO," by Joan Pickering as "RN Consultant," and by Christine Casey as "BSN Regional Manager," on behalf of On-Call. In addition, LPNs coming to work for On-Call are required to execute a form documenting that they "read the policy and procedure manual and fully understand all of . . . On-Call Staffing's policies and procedures and agree to follow and work according to the agency's guidelines." (Doc. No. 144-4, at 15.)

The "purpose" of the Manual, as set forth therein, is "simply to inform you as to what you generally can expect from our organization and what we expect from you. It is our belief that this handbook will be helpful in answering your day-to-day questions." (Doc. No.144-4, at 10 (Manual excerpt).) The Manual outlines a progressive plan of disciplinary action for failure to comply with company policy, including verbal warnings, written warnings and termination. Causes for termination set forth in the Manual include excessive absenteeism, insubordination and "any other infraction of company policies." (*Id.* at 11.) In addition, although there are multiple acceptable methods of charting, keeping nurses' notes, maintaining the clinical record, and so forth, the Manual contains specific instructions for performing these tasks. (*Id.* at 11–12.) It also sets forth specific instructions on how to perform such common nursing procedures as hand washing, medication administration, hair shampooing, cold pack administration, foot soaks, intravenous access, fecal impaction removal, tracheotomy care, injections, and

more than one hundred other frequently used procedures. On-Call places a Manual in the home of each patient where an LPN works so the LPN can refer to it as necessary.

Once an LPN applicant is accepted and placed on On-Call's "active" roster, an On-Call "placement employee" or "staffer" makes an assessment of the LPN's skills, based upon information provided by the LPN, and assigns the LPN to private-duty nursing cases commensurate with that LPN's identified skills. (Doc. No. 179-15, 8/24/2007 Dep. of J. Ayers ("Ayers Dep.") at 24-25.) Staffers are not trained medical personnel, and they make no independent assessment of an LPN's skills.

Each staffer is assigned to work with a number of patients, and they attempt to place LPNs in the homes according to each patient's needs. Staffers, therefore, generally work with a number of LPNs, and LPNs in turn work with various staffers for assignments. The scheduling process beings with the LPNs filling in a blank schedule with the days they want to work. LPNs are under no obligation to accept any referral, and may condition their acceptance upon a meeting with a patient. LPNs are not allowed to arrange for patient assignments, however, and if an LPN is not going to show up for a particular shift, she is required to call a staffer at least three hours before the shift is scheduled to begin. An LPN is not allowed to swap shifts with another LPN without the staffer's approval. Generally, if an LPN has a scheduling issue of some kind or wants to change her schedule for any reason, she must speak with the staffer assigned to the patient whose schedule is concerned. If an LPN is not happy with a situation or is not able to resolve the issue with the staffer, then the LPN appeals to that staffer's supervisor. (Ayers Dep. 81:12–23.)

The home health agencies establish the price of the health care being provided to the patient, including private-duty nursing. On-Call has no control over the prices being charged to the patient. On-Call does not dispute, however, that it has control over how much of the reimbursement amount it receives is paid to the LPN, as it is On-Call, not the home health agency, that pays the LPNs for their services. According to On-Call, the rate of pay to the LPN varies based upon the reimbursement rate paid by the home health agency to On-Call, as well as the type of care and level of skill needed. Occasionally, the LPN can negotiate a higher rate than is originally offered by On-Call to take certain shifts or patients.

Plaintiffs are required to wear uniforms, and to wear name tags on their uniforms that say "On-

Call Staffing."

Martha Stone, RN, On-Call's Regional Clinical Care Coordinator and former Director of Nursing Quality, admits that LPNs cannot supervise other LPNs because of limitations of practice placed upon LPNs by the State of Tennessee. Also according to Stone, On-Call has an organizational structure establishing employed RNs as the ultimate supervisory authority over LPNs regarding clinical issues. On-Call retains or employs RNs who perform annual competency exams on Plaintiff LPNs, and certifies each LPN as competent to perform private-duty nursing.

RNs employed by On-Call are responsible for recertifying, every thirty to sixty days, the Form 485, which prescribes the plan of care the LPNs are required to follow in performing their private-duty nursing responsibilities. RNs employed by On-Call are also responsible for performing supervisory visits at each patient's home every thirty or sixty days, depending upon the requirements of the applicable home health care agency. The purpose of these supervisory visits is to assess whether the Plaintiff LPNs have been appropriately executing the physicians' orders and complying with the plan of care in place for each patient as set forth in the Form 485. According to Defendants, the purpose of these visits is not to "supervise" the LPNs who care for the patient, but to ascertain whether the patient is receiving care (from those LPNs) in accordance with the physician's orders. Because these patients have in-home nursing care around the clock, one of the LPNs assigned to that patient is there during the RN's visit, but the others are not. The fact remains undisputed, however, that the purpose of the visits is to ensure that LPNs are complying with the plan of care put in place by the patients' physician and recertified by the RN. (*See* Doc. No. 138-1, 10/24/2007 Dep. of M. Stone ("Stone Dep.") at 13:10–12 ("We [RNs] supervise the LPNs, depending on the agency's policy, every month or every other month with a recert [*i.e.*, recertification of Form 485]."); *id.* 15:9–13 (agreeing that part of the purpose of the supervisory visits is to ensure the LPNs' "documentation reflects what they're doing in the home and that the M.D.'s orders are being carried out. Are they checking [the patients'] vital signs and whatever else the doctor has ordered for that particular patient.").) Stone also agreed that no one from On-Call is on site monitoring the LPNs on a daily basis to observe how they perform such nursing functions as checking blood pressure or changing dressings. Her function in performing the supervisory visits, again, is to make sure the LPNs are "fulfilling the plan of care that the doctor's ordered." (*Id.* 94:7–8.)

In addition, although Defendants insist that On-Call does not act as any sort of intermediary or messenger of medical information for the treatment of the patient, the record is clear that Plaintiffs are to go to the RN assigned to the particular patient with any medical questions or concerns.  (*See, e.g.*, Doc. No. 14-1, 5/29/2008 Decl. of S. Conatser ¶¶ 14, 15 (when Conatser had difficulty or problems with a patient, she would call her "supervising nurse," Deborah Farris, an RN employed by On-Call, who would assist her with clinical patient-care issues); Stone Dep. 16:15–19 (she would address any clinical concerns an LPN might have during her supervisory visits); *id.* 22–23 (agreeing the LPNs "under her" call her with any clinical concerns; other LPNs call the RNs above them); *id.* 24:11–17 ("An RN always has to go out and admit the patient.  An RN has to assume the responsibility of the recertification, so they were always the go-to person for the LPNs if they had a clinical question.  That's always the nursing structure.").

While on shift, each LPN must document in the nurses' notes at least every hour.  On-Call instructs LPNs on how to document in the nurses' notes.  (*See* Doc. No. 138-2, at 7–11, 6/12/2007 Letter to "All Private Duty Nurses," from Stacey McGovern "Per Elizabeth Tietsworth, Staffer," enclosing a memo entitled "Documentation for Private Duty Nursing," and directing recipients to "read everything carefully and then sign the signature form" and return the signature form to On-Call.)  Defendants maintain that On-Call simply passes on to the LPNs the home health agencies' various policies, but it is clear that On-Call is the intermediary between the LPNs and the home health agencies and that On-Call, not the home health agencies, directs the LPNs' performance of standard nursing tasks.

The LPNs are required to send to On-Call on a daily basis, via facsimile, their nurses' notes.  Plaintiffs are required to mail to On-Call's offices in Batesville, Mississippi their original nurses' notes, using self-addressed postage-prepaid envelopes provided by On-Call, at least twice a week.  An employee of On-Call compares the faxed copies with the mailed originals to make sure they are the same.  The notes are then forwarded to an employee nurse who ensures that the LPNs are executing the physicians' orders with respect to each patient.  If there's a problem, the nurse will bring it to the attention of the LPN whose notes are at issue.  (Garner Jr. Dep. 105:17–21.)  On-Call maintains that not all of the LPNs comply with the requirements regarding the frequency of sending in their nurses' notes, but does not dispute the fact that these requirements are in place.

On-Call, at its expense, provides the LPNs with forms on which the LPNs are to document their nursing care, including assessment sheets, nurses' notes, Intake and Output forms, vital sign sheets, respiratory care sheets, controlled substance sheets, medicine administration records, diabetic flow sheets, seizure report sheets, infection control sheets and occurrence reports. On-Call also provides the LPNs with time sheets, fax paper, supply request forms, envelopes, fax ink cartridges and fax machines (in the home of each patient) for use in performing their private-duty nursing responsibilities. When LPNs need additional paperwork supplies from On-Call, they fill out a Supply Request form and fax it to On-Call's home office. (Ayers Dep. 104.)

All the medical equipment necessary to deliver private-duty nursing care in compliance with a physician's orders is provided by the patient, the patient's insurer, or the home health agency with which On-Call contracted. Plaintiffs generally bring their own stethoscopes as a matter of preference, as well as certain other "basic nursing equipment," such as uniforms and gloves. LPNs are not expected to supply medical equipment such as glucometers, ventilators or pulse oximeters. However, On-Call does not provide these either.

On-Call pays the Plaintiff LPNs on an hourly basis for the work performed. Plaintiffs have never been paid overtime pay, that is, one and a half times their ordinary hourly rate, for work in excess of forty hours per week. No matter how well Plaintiffs do their job, they are only paid by the hour for the number of hours they actually work. Plaintiffs are responsible for their own transportation, except that travel nurses receive reimbursement for travel in excess of eighty miles, bonuses and lodging. Plaintiffs do not share in the profits of the Defendant business entities. Plaintiffs do not invest in the Defendant business entities. They are not allowed to take money directly from a patient. They do not contract directly with the patients in any way.

It is common and intrinsic to the industry that nurses at the LPN level often work for more than one staffing agency or for hospitals or nursing homes in addition to a staffing agency. It is clear that at least some of the Plaintiff LPNs work for other staffing agencies or hospitals in addition to working for On-Call.

As of August 2007, On-Call employed between sixty and eight people who managed and/or supervised account receivables, payroll, human resources, and staffing. (Doc. No. 139-1, 8/24/2007 Dep.

of E.L. Garner, Jr. ("2007 Garner Dep.") 98:4–12.)

      **B.      Facts Relevant to Second Motion for Partial Summary Judgment (Doc. No. 182)**

      In 1984 or 1985 E.L. Garner, Jr. was involved with two other shareholders in a company known as Helping Hands, Inc. that provided in-home health care services to patients in Tennessee through RNs, LPNs, certified nursing assistants (CNAs), physical therapists and other types of therapists. E.L. Garner, Jr. was not involved in the day-to-day operations of Helping Hands. He owned a twenty-five percent interest in the company and had fifty-one percent voting power, but his involvement consisted of attending monthly board meetings and helping to resolve disagreements between the other two shareholders. At some point in approximately 1985, Garner accompanied one of the other shareholders to a meeting with an attorney in Memphis for the purpose of having the attorney draft an independent contractor agreement to be used with the RNs, LPNs and CNAs that Helping Hands was in the business of placing. Garner and his colleague were assured that the contract and Helping Hands' use of RNs, LPNs and CNAs as independent contractors complied with "all the relevant laws." (2007 Garner Dep. 82:8–14; *see also* Doc. No. 179-5, 3/17/2008 Affidavit of E.L. Garner, Jr. ¶ 10.) E.L. Garner, Jr. does not remember much about the meeting, but believes that "the IRS deal, came out, 20 points" that "tells you if they're independent contractors or not." (2007 Garner Dep. 69:1–6.) Garner took the contract to his own attorney, who told him that if the other attorney had drafted it and it "met the smell test," then it should be okay. (*Id.* 70:1–9.) The ICA currently used by On-Call, and the contractor agreements that E.L. Garner, Jr. has used with all of his companies over the past twenty years, is basically the same contract as the one drafted by the attorney in 1985; it has been revised just to change the entities' names.

      Other than speaking with the attorney in Memphis and his own attorney around 1985, from that date until November 2006 when the Department of Labor began investigating Defendants, E.L. Garner, Jr. never sought any legal advice or made an effort to confirm whether the ICA On-Call uses for LPNs complies with the FLSA. No other law firms have looked at the contract or "tweaked" it since then. (*Id.* 88:3–12.) Garner does not recall any discussion regarding compliance with the FLSA specifically and was unaware of the existence of the FLSA until approximately January 2007. Garner believes that the lawyer in Memphis was probably astute enough to have considered the FLSA's requirements, but has no independent knowledge of that fact (Doc. No. 181-1, 1/24/08 Dep. of E.L. Garner, Jr. ("2008 Garner

Dep.") 71). He believes that the accountant for his companies "probably" mentioned the FLSA to him "a million times," but if so, Garner "never heard it" and does not recall his doing so. (2008 Garner Dep. 72:9–12.) Prior to January 1, 2007, no one at his companies was designated to ensure compliance with the FLSA. (*Id.* 74:11–17.) Lee Garner, III is likewise not aware of any effort made by anyone at On-Call to investigate the company's responsibilities under the FLSA prior to January 2007. (L. Garner III Dep. 51:7–16.) Since the formation of Guardian Angel Nursing, Inc. in Mississippi in 2001 or 2002, Lee Garner, III has never made any effort to gain an understanding of how the FLSA works.

E.L. Garner, Jr.'s wife owned a company called Associated Nursing, which provided private-duty nursing services until 1992, when it transitioned into a medical equipment business. Lee Garner, III believes that, while he was in college and working part-time for Associated Nursing, Associated Nursing "sometimes" paid overtime wages to private-duty nurses who worked more than forty hours per week. (L. Garner III Dep. 38:21–39–4; *id.* 42:14–17 (confirming he worked for Associated Nursing while in college).) E.L. Garner, Jr. testified in his deposition that he has "a feeling" that Associated paid its nurses using the same contract his companies use. He does not believe Associated Nursing paid overtime to its LPNs. (2008 Garner Dep. at 28:11–25.)

In the first half of 2005, E.L. Garner, Jr. was in discussions with Theo "Chief" Egbujor, CEO of Friendship Home Health Care, about buying an interest in Friendship's private-duty nursing business. Garner purchased an option to purchase a fifty-percent interest in Friendship, but ultimately never exercised that option. (2007 Garner Dep. 50–51.) In the summer of 2005, while the option was still open, Garner asked Egbujor if there were any "liens or lawsuits out there" that he needed to know about. (*Id.* 51:16.) Egbujor indicated there was a lawsuit against Friendship brought by the Department of Labor on behalf of Nina Wright, but it was "no problem" and would be handled. (*Id.* 51:18–21.) Garner asked what the dispute was about and Egbujor said "Oh, it's some stuff on some overtime." (2008 Garner Dep. at 45:25–46:1.) Garner asked no further questions, and Egbujor later told Garner the problem had been "handled." (2008 Garner Dep. at 47:18–19.)

In fact, in 2004, Friendship Home Health Care was sued by the United States Department of Labor for its failure to pay overtime to LPNs who provided private-duty care. An agreed order dismissing the claims was entered in January 2007, maintaining in effect the permanent injunction entered under the

FLSA in June 2005. *Chao v. Angel Medical Pool, Inc.*, 3:04-cv-00484, United States District Court for the Middle District of Tennessee, Order entered 1/9/2007.

E.L. Garner, Jr. is aware that, over the last several years, some of his LPNs have sought unemployment compensation after ceasing to be associated with his companies in Tennessee, and each time the Tennessee Employment Security Division has ruled that the LPNs are independent contractors rather than employees and therefore are not entitled to unemployment benefits. In addition, to E.L. Garner, Jr.'s knowledge, all the companies with which he personally had come into contact that are in the business of staffing private-duty nurses, all treat their LPNs as independent contractors. Garner admitted, however, that he does not have any knowledge of the practice of the "vast majority" of nursing providers. (2007 Garner Dep. 79–80.)

## II.     STANDARD OF REVIEW

Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment must be denied "[i]f there are 'any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. . . .' " *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment is appropriate as to "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that

there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, Federal Practice and Procedure, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.* Regardless, the mere existence of a scintilla of evidence in support of the non moving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "[T]here must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the non-moving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## III.  ANALYSIS AND DISCUSSION

### A.  Plaintiffs' First Motion for Partial Summary Judgment

#### 1.  *Whether Plaintiffs Were Defendants' Employees for FLSA Purposes*

The FLSA defines employment relations very broadly. Under the statute, "employee" is defined as "any individual employed by an employer," 29 U.S .C. § 203(e)(1), while "employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203(g). The Sixth Circuit has recognized that the FLSA's definition is broader than the common-law definitions used by other statutory schemes. *Imars v. Contractors Mfg. Servs.*, Inc., 165 F.3d 27 (Table), 1998 WL 598778, at *5 (6th Cir. Aug. 24, 1998) (citing *Nationwide Mut.*

*Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that FLSA has broader coverage than ERISA, which relies on traditional agency-law principles to determine employee status)). Under the statutory scheme, the question of who qualifies as an "employee" is "to be determined in light of the purposes of the legislation," so that "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (quotation marks omitted) (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 145 (6th Cir. 1977)).

The so-called "economic realities" test applied by the Sixth Circuit, among others, accordingly "looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself. This test is a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992) (internal citations omitted). The question of whether a particular situation is an employment relationship is generally a question of law. *Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994). However, where there is a genuine issue of fact or if conflicting inferences can be drawn from the undisputed facts, then the question must be resolved by the finder of fact. *Lilley*, 958 F.2d at 750 n.1. Likewise, if the factors to be considered in applying the "economic realities" test are in "equipoise," the ultimate decision is reserved for the trier of fact. *See Imars*, 1998 WL 598778, at *5 (reversing summary judgment for the plaintiff and remanding for trial, finding that the trial court had erred in considering the presence of a contractor agreement to be a tie-breaker where the other factors were essentially balanced, stating, "The appropriate weight of the factors can be more properly assessed after a trial.").

The factors that have been considered by the Sixth Circuit under the "economic realities" test include the following:

(1) the permanency of the relationship between the parties;

(2) the degree of skill required for the rendering of the services;

(3) the extent of the worker's investment in equipment or materials for the task;

(4) the worker's opportunity for profit or loss, depending upon his skill;

(5) the degree of the alleged employer's right to control the manner in which the work is performed; and

(6) whether the service rendered is an integral part of the alleged employer's business.

*Imars*, 1998 WL 598778, at *3; *Brandel*, 736 F.2d at 1117 & n.5

In *Brandel*, the Sixth Circuit "inverted" the sixth factor to ask whether the workers were economically dependent upon the business for which they were laboring. *Brandel*, 736 F.2d at 1120. In answering that question, the court looked to other factors, including (1) whether the worker was subjected to long hours at low wages; (2) whether similar work was available elsewhere; and (3) whether the alleged employer unilaterally controlled the rate of pay. *Id.* The Sixth Circuit also noted in *Brandel* that "[t]he issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity." *Brandel*, 736 F.2d at 1116. *Accord Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988) ("The factors that have been identified by various courts in applying the economic reality test are not exclusive. Since the test concerns the totality of the circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided.").

Further, the Sixth Circuit, like every other court that has considered the issue, has explicitly recognized that the parties' contractual intention is not dispositive of the question of whether an employment relationship exists, on the basis that "[t]he FLSA is designed to defeat rather than implement contractual arrangements." *Imars v. Contractors Mfg. Servs.*, Inc., 165 F.3d 27 (Table), 1998 WL 598778, at *5 (6th Cir. Aug. 24, 1998) (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1544–45 (7th Cir. 1987); and citing *Real v. Driscoll Strawberry Assoc.*, 603 F.2d 748, 755 (9th Cir.1979) ("Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA.")). Although the existence of an explicit contractual arrangement is not dispositive, such a contract may be probative of the nature of the economic relationship between the parties. *Imars*, 1998 WL 598778, at *6.

As Judge Nixon also recognized, in ruling on a similar motion in a companion case to this one, the economic realities test is of somewhat questionable utility, given that "few of the factors necessarily make[ ] economic sense, and all of the factors are far too easy to manipulate and mold during application to suit a preconceived result." *Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07-0069, 2008 WL 2944661, at *11 (M.D. Tenn. July 31, 2008) (quoting *Imars*, 1998 WL 598778, at *5). As Judge Nixon continued:

> Indeed, it requires only a very cursory view of the economic realities factors to recognize that they permit of numerous exceptions and may be dubious indicators. For example, with respect to the permanence of the working relationship, while it is plausible to presume that employment relationships are more likely to span greater periods of time than independent contracting ones, which tend to be job specific, it is obvious that a prototypical employment relationship may be terminated almost as soon as it's begun.

> The second factor – the degree of skill involved – is similarly porous; this factor presupposes that a higher degree of skill suggests independent contractor status, but examples to the contrary are myriad.
>
> The portent of these difficulties with the economic realities test is that this Court must proceed with caution in applying it.

*Id.* at *11–*12.  This Court will likewise proceed with the requisite degree of caution in considering the relevant factors.

As an initial matter, however, the Court rejects Defendants' argument that Plaintiffs' motion should fail because it "relies solely upon a generalized collective assembly of facts instead of the Sixth Circuit's individualized, fact intensive analysis."  (Doc. No. 177, at 3.)  Defendants have not shown that the individual LPNs' situations vary to such a degree that consideration of each individual circumstance is required.  To the contrary, the factors that are most relevant to the determination of whether Plaintiffs should be deemed employees or independent contractors do not appear to vary much from one LPN to the next.

### (a)     The Permanence of the Working Relationship

Plaintiffs argue that the permanency of the relationship has been established by the fact that "defendants attempted to contract with each plaintiff LPN for a renewable term of one (1) year to provide private-duty nursing services to patients of Quality and other home health agencies."  (Doc. No. 145, at 19.)  Plaintiffs also point out that at least some of the contracts contain non-competition/non-solicitation provisions, which the Guardian Angel entities have attempted to enforce against at least three LPNs.  Plaintiffs also argue, it should be acknowledged, that the terms of the ICAs are not actually relevant to the question of whether Plaintiffs should be deemed independent contractors or employees.  For their part, Defendants place little emphasis on this question, and they do not point to any facts in the record suggesting either permanence or transience.  Instead, they simply assert that in the case upon which Plaintiffs rely most heavily, *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988), the Second Circuit "found that . . . the 'permanence of the working relationship' weighed in favor of independent contractor status.' "  (Doc. No. 177, at 22 (quoting *Superior Care*, 840 F.2d at 1060).)

Contrary to the Defendants' assertion, while the court in *Superior Care* first noted that the transience of the working relationship "*may* weigh slightly in favor of independent contractor status," *Superior Care*, 840 F.2d at 1060 (emphasis added), it ultimately concluded that "the fact that these

[plaintiff] nurses are a transient work force reflects the nature of their profession and not their success in marketing their skills independently." *Id.* at 1061. The actual evidence of the plaintiffs' transience in *Superior Care* was much more compelling than it is here, as the facts there showed that the plaintiffs "typically" worked for several employers; seventy-eight percent of them had worked for the defendant for thirteen weeks or fewer during one of the years at issue, and there was a ninety-percent turnover rate in a three-year period. The court nonetheless held that such transience was not dispositive of independent contractor status, particularly given that "the lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative." *Id.* at 1060–61.

In the present case, the parties have presented little evidence regarding the transience or permanence of Plaintiffs' working relationship with Defendants, but have basically stipulated that it is common and intrinsic to the industry that nurses at the LPN level often work for more than one staffing agency, or for hospitals or nursing homes in addition to a staffing agency. It is also clear that at least some of the Plaintiff LPNs have worked for other staffing agencies or hospitals in addition to working through On-Call, though it is not clear how many. Others testified that they do not have time to work for rival agencies because of the amount of time spent working for Defendants, or because they are required to remain on call for the Defendants.

The Court concludes, based upon the parties' stipulations, that, as in *Superior Care*, the job of LPN is somewhat transient, but that the "lack of permanence is due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative." *Id.* Even assuming a certain degree of transience, the evidence in the record does not suggest that the overall transience of the relationship somehow contributes to a conclusion that Plaintiffs were in business for themselves as opposed to being dependent upon Defendants for the opportunity to render service, the ultimate question the balancing test was designed to determine. *Id.* at 1059; *accord Imars*, 1998 WL 598778, at *3; *Lily*, 958 F.2d at 750; *Brandel*, 736 F.2d at 1116. This Court therefore finds that this factor under the circumstances should be given little emphasis to begin with and, in any event, does not weigh strongly in favor of either party. *Cf. Wilson*, 2008 WL 2944661, at *12 (likewise concluding that "the relative transience of Plaintiffs as a group of workers [would] be given little weight" as it signaled, "not that Plaintiffs are an enterprising group who successfully brokered their skills for isolated assignments, but rather that the industry as a whole does not

guarantee steady work with one company for those in need of full-time hours").

      **(b)**      **The Degree of Skill Required of LPNs in Private-Duty Nursing**

Under Tennessee law, LPNs are required to have a high school diploma or general equivalency diploma (GED), and to have "successfully completed a course of study in an approved school for practical nurses." Tenn. Code Ann. § 63-7-109. They generally must also pass an examination administered by the Tennessee Board of Nursing before they receive their licensure. Tenn. Code Ann. § 63-7-1110(a). LPNs are not required to have the same level of education or training as RNs, Tenn. Code Ann. § 63-7-108, but it is nonetheless clear that LPNs may correctly be characterized as licensed professionals. Defendants argue that, as licensed professionals, LPNs must exercise independent judgment and function without close supervision in order to perform their jobs, and that this fact weighs in favor of finding independent contractor status. They also argue, again, that the Second Circuit in *Superior Care* found the plaintiff LPNs in that case sufficiently skilled and independent that this factor weighed in favor of finding independent contractor status.

In reality, while there was no dispute in *Superior Care* that the nurses there were "skilled workers who require several years of specialized training," the court nonetheless observed that "the fact that workers are skilled is not itself indicative of independent contractor status." 840 F.2d at 1060. The court noted:

> The nurses in the present case possess technical skills but nothing in the record reveals that they used these skills in any independent way. Rather, they depended entirely on referrals to find job assignments, and Superior Care in turn controlled the terms and conditions of the employment relationship. As a matter of economic reality, the nurses' training does not weigh significantly in favor of independent contractor status.

*Id.* In other words, the court found that, while the degree of skill possessed by LPNs might ordinarily weigh in favor of independent contractor status, under the specific facts shown there, the degree of skill did not weigh in favor of finding independent contractor status.

Similarly, in *Wilson*, Judge Nixon observed that "skills are not the monopoly of independent contractors," *Wilson*, 2008 WL 2944661, at *13 (quoting *Lauritzen*, 835 F.2d at 1537), and further posited that the relevant question under the skills factor was "whether the worker's skills are 'more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor.' " *Id.* (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730

(1947)).  "It is thus essential to ask whether, in the larger picture, LPNs have the skills necessary to locate and manage discrete work projects characteristic of independent contractors, or whether their skills are of the task-specific, specialized kind that form a piece of a larger enterprise, suggesting employee status." *Id.*

Like Judge Nixon, this Court finds that Plaintiffs' skill set, under the facts presented here, clearly falls in the latter category.  Plaintiffs have not been shown to have the skill or connections to find their own clients, but instead are dependent on companies such as Defendants for placements.  *Cf. Richardson v. Genesee County Cmty. Mental Health Servs.*, 45 F. Supp. 2d 610, 614 (E.D. Mich. 1999) (finding RN plaintiffs' reliance on others for job placements indicative of employment as opposed to independent contractor status).  Once placed with a specific patient or patients, Plaintiffs are not permitted in any sense to budget their own time, but must report for shifts as scheduled by a staffer employed by Defendants.  While on shift, they are required to provide the treatment prescribed in the Form 485, the formal treatment plan developed for each individual patient.  Plaintiffs play no part in the development of the treatment plan, and any step or procedure they deem necessary that has not been previously prescribed and incorporated into the formal plan of care must first be approved by an RN or physician.  Thus, like the LPNs in both *Wilson* and *Superior Care*, the LPN Plaintiffs here possess skills that they must exercise with some degree of independence in order to perform the work, just by virtue of the nature of the work and the industry, but the actual functions that must be performed are prescribed for them quite specifically, leaving only a very narrow range within which to exercise any degree of autonomy.  In other words, "at every stage in the process, the skill-set of the LPNs plays a limiting role, forcing the LPNs to rely on the expertise of others while leaving for themselves a narrow, rather mechanized role."  *Wilson*, 2008 WL 2944661, at *13; *cf. Superior Care*, 840 F.2d at 1060 ("The nurses in the present case possess technical skills but nothing in the record reveals that they used these skills in any independent way.")  The type of skills possessed by Plaintiffs here therefore weighs fairly strongly in favor of finding employee rather than independent contractor status.

> **(c)   The Extent of the LPNs' Investment in Equipment or Materials**

The Sixth Circuit has held that "[t]he capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or

that the worker is simply using implements of the [alleged employer] to accomplish the task." *Brandel*, 736 F.2d at 1118–19.  Defendants argue that *Brandel* is instructive here.  In that case, the court found that the issue of capital investment was "not particularly dispositive" on the issue of employment status given the context of the industry.  The workers in question had a relatively small investment in their business, consisting of a bucket and a pair of gloves, while the purported "employer" owned grading and sorting equipment, scales and farm buildings.  The workers' business, however, was picking pickles, and there was no dispute that the farmer himself had invested very little capital "in the equipment and materials required for the farm workers' task of harvesting the pickles." *Brandel*, 736 F.2d at 1118.  Based on the particular facts of the industry at issue, the court concluded that "the system of harvest employed [there] eliminates the need for heavy capital investment.  While the factor may be important in other contexts . . . it is not determinative of the issue of employment in this case." *Id.*

In the present case it is clear that Plaintiffs are not required to make any substantial investment in materials or equipment in order to perform as LPNs in private-duty nursing.  And Defendants correctly point out that they do not invest in expensive medical equipment either.  Rather, it is the patients themselves, the patients' insurers or the home health agencies that cover the cost of any durable medical goods.  Defendants operate a staffing business, however, and are engaged in the placement of LPNs in the private-duty setting.  It is therefore not particularly relevant that Defendants have not invested in medical equipment.  Instead, they have invested in the staffing business.  Defendants operate in a multi-state region; they have opened and equipped regional offices and hired full-time staff (sixty to eighty individuals as of August 2007) to achieve the goals of their business.  They place office equipment, including a fax machine and various office supplies, as well as Policy and Procedure Manuals and other written materials, in the homes of each patient served for the use of the LPNs, who are required to use that equipment in order to comply with the Defendants' directives.  Although the amount and cost of the equipment placed in the patients' homes for the Plaintiffs' use is not considerable, it is nonetheless clear that Defendants' investment in the business of placing LPNs substantially outweighs Plaintiffs' investment in the tools of their trade.  To the extent this factor is entitled to any weight at all, it would weigh slightly in favor of finding that Plaintiffs are employees rather than independent contractors.

(d)    **The LPNs' Opportunity for Profit or Loss**

As Judge Nixon noted in *Wilson*,

The question under the opportunity for profit or loss factor is whether Plaintiffs' earnings were tied to their performance once they accepted work. . . .  It is the mark of an independent contractor that a stake in the venture provides both carrot and stick, such that planning, efficiency and skill are rewarded above and beyond the initial contract.

*Wilson*, 2008 WL 2944661, at *14 (citing *Imars*,1998 WL 598778, at *6; *Brandel*, 736 F.2d at 1119).

Defendants here argue that "Plaintiffs' opportunities for profit [are] completely within their control" insofar as they have the discretion to "negotiate their own schedule and choice of patients," and are free to turn down work that requires a two-hour commute, for example, in order to hold down their costs. Besides presenting evidence indicating Plaintiffs are not required to accept any referral and are free to turn down available shifts, and have the ability to choose to work for other staffing agencies, Defendants also point out that even Plaintiffs concede the existence of a "national nursing shortage," and further assert that Plaintiffs "can hold themselves out to the highest bidder."  (Doc. No. 177, at 16.)  Finally, Defendants contend Plaintiffs are exposed to a "real risk of losing money," based on the type of business-related expenses the Plaintiffs have listed on their tax returns.

Even accepting Defendants' evidence as true, there are certainly no facts in the record to support Defendants' assertion that Plaintiffs can hold for the highest bidder.  Moreover, the business expenses identified on Plaintiffs' federal tax returns for purposes of calculating deductions, in accordance with federal law, are not dispositive of, and in fact have no real relevance to, the question of whether Plaintiffs are exposed to a risk of loss.[2]  What remains clear is that Plaintiffs are paid by the hour for the number of hours they actually work, regardless of how well they perform their jobs.  They have little control over how much work they receive from Defendants beyond being able, at least in theory, to turn down work or shifts they do not want.  Under virtually identical circumstances to those presented here, Judge Nixon and the Second Circuit both concluded it was "obvious" that the plaintiff LPNs in those cases "had no opportunity for profit or loss."  *Wilson*, 2008 WL 2944661, at *14 (citing *Superior Care*, 854 F.2d at 1059 (finding the plaintiffs' lack of opportunity for profit or loss "weigh[ed] heavily in favor of the . . . conclusion that the

---

[2] For example, the fact that it was possible for certain Plaintiffs to take a deduction for such things as "car and truck expenses," depreciation and uniforms does not mean they were exposed to a potential loss.  It is apparent that the expenditures associated with these deductions are of the type Plaintiffs would likely have made regardless of whether they believed they should be classified as employees or independent contractors.

nurses [were] employees")).  This Court concurs with that conclusion.  This factor weighs in favor of finding that Plaintiffs are employees.

(e)      **The Degree of Defendants' Control**

Defendants argue that they exercise no supervision over the details of Plaintiffs' work, that Plaintiffs are required to exercise their own professional judgment to perform the work, and that the facts of this case are therefore analogous to those of *Brandel*, in which the pickle harvesters were deemed to be independent contractors.  Defendants also rely on the language of the ICA, pursuant to which, they claim, Defendants gave up any right or responsibility to supervise, control or direct the LPNs, and Plaintiffs are required to exercise their own independent judgment.

The Defendants' arguments are unpersuasive.  The Court finds that the operative undisputed facts undeniably demonstrate that Defendants exercise a high degree of control over Plaintiffs' work.  Of particular importance is the fact that, by statute, LPNs cannot practice independently; they must be under the supervision of a registered nurse or physician.  Tennessee law defines the "practice of practical nursing" as the "performance for compensation of selected acts required in the nursing care of the ill, injured or infirm and/or carrying out medical orders prescribed by a licensed physician or dentist," Tenn. Code Ann. § 63-7-108, and requires that LPNs work "under the direction of a licensed physician . . . or professional registered nurse."  *Id.*  In other words, LPNs are effectively prohibited by law from exercising any significant degree of independent medical judgment or initiative.

Moreover, while Plaintiffs are not obligated to accept any shifts, they can only work those hours offered and approved by Defendants.  LPNs who cannot work a scheduled shift have to notify Defendants, and are not allowed to substitute or swap shifts without Defendants' approval.  In addition, Plaintiffs are apparently required at times to work more than the hours scheduled if the next scheduled LPN does not arrive on time, so that the patient is not left alone.

The evidence is also clear that Defendants exercise a high degree of control over the manner in which Plaintiffs conduct their duties while in patients' homes.  Although the parties dispute the import of the Policies and Procedures Manual distributed by Defendants, the Manual clearly was produced for and is provided to Plaintiffs for their use and reference.  Defendants place a Manual in each patient's home— certainly not for the patient's use.  In addition, LPNs coming to work for On-Call are required to execute a

form documenting that they have "read the policy and procedure manual and fully understand all of . . . On-Call Staffing's policies and procedures and agree to follow and work according to the agency's guidelines." (Doc. No. 144-4, at 15.) And, although there are multiple acceptable methods of performing common nursing procedures, the Manual sets forth specific instructions on how to perform many of these procedures.

Another important consideration is the fact that Plaintiffs' work duties are largely predetermined by Defendants' company policy. LPNs must first make an assessment of the client and then proceed with the plan of care outlined in Form 485. LPNs must create nurses' notes hourly and must also fax, and later mail, documentation to Defendants.

As documented by the Defendants' "Code of Conduct," also distributed to the Plaintiffs, Defendants control the manner in which Plaintiffs conduct themselves as representatives of Defendants' company. Plaintiffs are required to wear name tags that say "On-Call" on them. Pursuant to the dictates of the Code of Conduct, Plaintiffs can be terminated for such things as disobedience or insubordination to "supervisors"; discussing personal problems with patients; absence from work without a supervisor's authorization or a physician's permit; taking more than the permitted or specified time for meal breaks or rest periods; having visitors while on duty "without authorization from your supervisor"; failure to attend a staff meeting without prior approval; reporting to work out of uniform or dressed inappropriately; or leaving a patient alone for any reason during shift hours. (Doc. No. 14-2, at 11–12, Employee Code of Conduct.) Defendants claim that many of these mandates do not apply to Plaintiffs because they are not deemed employees and are not supervised, and that no LPNs have actually been fired or disciplined for failing to comply with the mandates set forth in the Code of Conduct or the Policy and Procedures Manual. That response, however, begs the question of why Defendants adopted either of those documents in the first place. Moreover, while many of the rules simply reflect sound judgment, the fact remains that the LPNs are not permitted to exercise discretion in regards to these matters, and can be terminated if they do not follow them—even if in practice, violations are difficult to detect and rarely addressed.

Defendants contend that because a certain amount of supervision is mandated by the state or by the home health agencies with which they contract, it somehow does not count toward the quantification of the degree of control exercised. Defendants also place great emphasis on the fact that Plaintiffs work

alone in the patients' homes, without direct or continuous oversight, thus requiring them to exercise independent professional judgment. Notwithstanding, the extent to which Plaintiffs work without direct supervision is not sufficient to defeat a finding of control, particularly since the nature of the industry is such that constant oversight is impracticable. As the Second Circuit, and Judge Nixon, have likewise noted, "[a]n employer does not need to look over his workers' shoulders every day in order to exercise control." *Superior Care*, 840 F.2d at 1059., This Court, like Judge Nixon under basically identical circumstances, agrees that the controlling question is whether Defendants essentially told Plaintiffs how to do their job. The answer to that question is "yes." This factor therefore weighs in favor of Plaintiffs.

(f)     **Whether Plaintiffs' Services Are Integral to Defendants' Business**

Defendants do not really address this question. Instead they argue emphatically that they have no control over the prices charged to patients because On-Call does not contract with patients, and that because of the national nursing shortage, Plaintiffs have the ability to negotiate their hourly rate. Defendants have not shown, however, that the hourly rate paid to Plaintiffs is necessarily tied to the reimbursement rate Defendants receive from the home health agencies with which they contract, nor is there any evidence that Plaintiffs have much room within which to negotiate. The undisputed fact remains that Defendants have final control over the hourly rate paid to Plaintiffs.

Defendants also argue that they are not in the business of providing health care, as if this means that Plaintiffs' services, which do involve the provision of health care, are not integral to Defendants' business. Defendants are in the business of providing health care personnel on request, and the vast majority of the health care personnel they provide are LPNs, who provide primarily private-duty nursing services. There can be no dispute that the work performed by the Plaintiff LPNs is at the heart of Defendants' business. Without the LPNs, Defendants would not be in business. This factor too weighs in favor of finding that Plaintiffs are employees rather than independent contractors.

(g)     **Other Relevant Factors**

In *Wilson*, Judge Nixon considered other factors, including whether the workers are subjected to long hours at low wages, whether similar work was available elsewhere, and whether the alleged employer unilaterally controlled the rate of pay. The parties here have not discussed these issues with any degree of depth, though Defendants point out that Plaintiffs are hardly poorly paid and are able to find

work elsewhere.  Defendants also claim that they do not unilaterally control the rate of pay, since they do not control the amount by which they are reimbursed by the home health agencies, and that Plaintiffs on occasion are able to negotiate a higher hourly rate.  On the other hand, Plaintiffs have proffered undisputed evidence indicating they frequently work long hours, sometimes not by their choice, and that the pay rate is largely determined by Defendants.  In any event, the Court finds that these issues have been taken into consideration in the context of considering the other factors above, and that they do not offer much additional insight into the question of whether Plaintiffs are employees or independent contractors.

Finally, as indicated above, the Sixth Circuit has held that while the existence of a contract is not dispositive, it may be considered as evidence of the nature of the economic relationship between the parties.  *Imars*, 1998 WL 598778, at *6.  In this case, as Plaintiffs point out, the contract does not even set forth an hourly rate; instead it simply specifies that On-Call will pay for properly documented services rendered by the LPN.  (*See* Doc. No. 62-13, sample ICA ¶ 3.1.)  Plaintiffs were basically required to sign the contract without negotiating its terms in order to work for On-Call.  Under the circumstances presented here, the Court does not find the existence of the contract to have any particular relevance to the parties' economic relationship.

(h)    **Employment Relationship**

The ultimate question the Court must decide is whether Plaintiffs are economically dependent upon Defendants, considering the factors identified above and viewing the relationship in its totality.  On the basis of the foregoing discussion, the Court finds that Plaintiffs are Defendants' employees within the meaning of the FLSA.  They are reliant upon Defendants for placements and scheduling, and their skill set does not permit them to make decisions about the nature of the care to be given to the patients for whom they provide such care.  Defendants, on the other hand, oversee Plaintiffs' work to ensure that it complies with the plan of care prescribed by a physician in accordance with the procedures approved by the home health agencies with which Defendants contract.  Plaintiffs make no significant investment in equipment or materials, and have no real opportunity for profit or loss in the course of their work with Defendants.  Defendants exercise a high degree of control over Plaintiffs, monitoring their work for purposes of ensuring compliance with state regulations, the wishes of the home health agencies, and

their own business good will.  Finally, Plaintiffs perform the most essential function within Defendants' enterprise:  private-duty nursing.  This Court concludes, as did Judge Nixon under virtually identical facts, that Plaintiffs are employees entitled to the overtime protections of the FLSA.  Plaintiffs are therefore entitled to summary judgment in their favor as to that issue.

### 2.    *Whether Defendants Are Jointly and Severally Liable*

Plaintiffs assert that all the corporate defendants as well as both E.L. Garner, Jr. and Lee Garner, III should be held jointly and severally liable for violation of the FLSA under the "integrated enterprise" theory or test.   Defendants, for their part, concede that to the extent Plaintiffs are deemed to be employees under the FLSA, the Guardian Angel entities, On-Call Staffing, Inc. (in Tennessee and Mississippi), and E.L. Garner, Jr. may be held jointly and severally liable for any violations of the FLSA. Summary judgment in favor of Plaintiffs as to the joint and several liability of those Defendants is therefore appropriate and will be granted.  Defendants dispute, however, that Quality Care Home Health or Lee Garner, III have been shown to have engaged in any acts that would justify imputing liability as to them.

Under 29 U.S.C. § 203(d), the FLSA defines an "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir.1991).  The Sixth Circuit has held, based upon that definition, that more than one "employer" can be simultaneously responsible for FLSA obligations.  *Id.*  " 'The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.' "  *Id.* (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)).

The Sixth Circuit has noted that "no one factor is dispositive" in determining whether an individual may be jointly and severally liable with a corporate employer under the FLSA.  Rather, courts should focus on the "economic realities presented by the facts of each case."  *Elliot Travel & Tours*, 942 F.2d at 965 (quoting *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 195 (5th Cir.), *cert. denied*, 463 U.S. 1207, (1983)).  Resolution of the question does not rest upon mere ownership interest or the position formally held within the company, however.  In the Sixth Circuit, and in those cases cited approvingly by the Sixth Circuit in support of its decisions, the focus has been upon the degree of an individual's "operational

control of significant aspects of the corporation's day to day functions . . . and who personally made decisions" regarding the corporation's direction. *Elliot Travel & Tours*, 942 F.2d at 965 (quoting *Donovan v. Agnew*, 712 F.2d at 1514). In *Elliott*, the individual at issue was president of the corporation and was found to have been "involved in the business operations of the corporation," "controlled the purse strings of the corporation," and determined the amount of employee salaries. *Id.* at 966. He was held to be an employer for purposes of the FLSA, and therefore jointly and severally liable with the corporate employer for violations of the FLSA. Likewise in *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994), the individual whom plaintiffs sought to hold jointly and severally liable with the corporate employer had a significant ownership interest in the company, was CEO of the company, controlled significant functions thereof, determined salaries and made hiring decisions. The court held that the district court had erred in determining that this individual was not personally liable for the judgment against the company for FLSA violations. *Id.*

With respect to the role played by Lee Garner, III in the present case, the Court finds that there is a question of fact—created by Defendants—as to whether Lee Garner, III exercised any leadership functions as president and sole director of On-Call. Most of the evidence in the record indicates that E.L. Garner, Jr. was the "brains" behind the operations and "basically ran the company" (Dep. of L. Garner, III at 9:1–2), at least until either the summer of 2007 or the spring of 2006 when Lee Garner, III began managing On-Call's servicing of the Greater Memphis region. However, in a deposition given in August 2007, E.L. Garner, Jr. agreed that Lee Garner, III, as president of On-Call, had the authority and ability to do something about it if he thought the company was out of compliance with the law. (2007 Garner Dep. 62:3–17.) E.L. Garner, Jr. also asserted that when he established the company in 2001 or 2002, he set it up for Lee, and that he himself had no role other than to provide free advice. He agreed that Lee Garner, III was "in it day-to-day" from the beginning while he was not (*id.* 73:4–9), and that Lee Garner, III was "head of the company" and was in "operational control." (*Id.* 73:25–74:8, 75:2–18.)

The Court agrees with Defendants that the question of who actually exercised control is the relevant inquiry, but there remains a material dispute of fact as to whether Lee Garner, III exercised sufficient control over On-Call's operations such that he should be deemed an "employer" for purposes of the FLSA. Plaintiffs' motion for summary judgment as to Lee Garner, III on the basis that he should be

jointly and severally liable as the Plaintiffs' "employer" for purposes of the FLSA will therefore be denied.

With respect to Quality's potential liability, Plaintiffs have not advanced any specific arguments other than to contend that all of the corporate entity defendants share a common central office in Batesville, Mississippi; share equipment, employees, an office and operations manager, and corporate officers; and have integrated financial and payroll information. In light of these factors, Plaintiffs argue generally that "the various individuals and entities involved are so entangled and intertwined that they constitute a single employer for FLSA purposes." (Doc. No. 145, at 27.)

Defendants do not directly address the question of Quality's potential liability at all. The Court nonetheless finds that Plaintiffs have not carried their burden of establishing that they are entitled to judgment as a matter of law on the undisputed facts as to Quality under an "integrated enterprise" theory. The issue presented here is whether Quality, as a subsidiary or a sister corporation to the On-Call and Guardian Angel entities, can be held jointly and severally liable with those defendants, when Quality itself has never had a direct relationship with the Plaintiffs. None of the cases cited by Plaintiffs is remotely on point as to that question. *See, e.g.*, *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990 (6th Cir. 1997) (applying integrated enterprise test in context of ADA and ADEA claims to conclude that the defendant university was not jointly and severally liable with the book store with which it contracted to operate a campus book store); *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983) (considering whether the corporate parent could be jointly and severally liable for its subsidiary's alleged violation of Title VII under a single-enterprise theory); *Takacs v. Hahn Automotive Corp.*, Case No. C-3-95-404, 1999 U.S. Dist. LEXIS 21694 (S.D. Ohio April 23, 1999) (holding that the corporate parent was liable for a bankrupt subsidiary's FLSA violations under the integrated enterprise test). Plaintiffs have not pointed to any facts suggesting that Quality is a sham corporation or that it had any control over any aspect of their pay, scheduling, or job description. Plaintiffs' motion for summary judgment as to Quality's joint and several liability will therefore be denied.

**B.    Plaintiffs' Second Motion for Partial Summary Judgment**

In their second motion for partial summary judgment (Doc. No. 182), Plaintiffs argue that (1) the undisputed facts demonstrate that the Defendants failed to make a "good faith" effort to comply with the FLSA, such that Plaintiffs will be entitled to liquidated damages as a matter of law; and (2) because

Defendants "willfully" failed to pay overtime as required by law, the three-year statute of limitations prescribed in 29 U.S.C. § 255(a) applies to Plaintiffs' claims.

### 1. Whether Defendants Can Establish They Acted in Good Faith

The FLSA provides that any employer found to have violated its provisions "shall be liable" to the affected employees in the amount of their unpaid overtime compensation as well as liquidated damages in an equal amount. 29 U.S.C. § 216(b). Liquidated damages are deemed "compensation, not a penalty or punishment." *McClanahan v. Mathews*, 440 F.2d 320, 322–23 (6th Cir. 1971) (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583 (1942)). The Act grants courts the discretion to decline to award liquidated damages "if the employer shows to the satisfaction of the court that the act or omission . . . was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. In other words, an award of liquidated damages is the norm; courts may decline to award liquidated damages in exceptional circumstances "*if, and only if,* the employer shows that he acted in good faith and that he had reasonable grounds for believing that he was not violating the Act." *Dole v. Elliot Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991) (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir.1982) (emphasis in original)).

To prove that it acted in good faith, an employer "must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3d Cir. 1991), *quoted in Martin v. Ind. Mich. Power Co.*, 831 F.3d 574, 584 (6th Cir. 2004). The Sixth Circuit has recognized that "[t]his burden on the employer is substantial." *Elwell v. Univ. Hosp. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002). Moreover, employers have an "affirmative duty to ascertain and meet the FLSA's requirements." *Ind. Mich. Power*, 381 F.3d at 584. As a result, mere ignorance of the law is not sufficient to prove good faith. *Cf. Elwell*, 276 F.3d at 841 (finding defendant should have requested an opinion from the Department of Labor regarding compliance with the FLSA).

It is clear in this case that Defendants cannot establish good faith. E.L. Garner, Jr. met with an attorney in 1984 or 1985 for the purpose of drawing up an enforceable contract to use with all the RNs and LPNs who worked for the company with which Garner was affiliated at that time. The result of that consultation was a contractor agreement practically identical to the ICA still used by On-Call more than

twenty years later, and assurance from the attorney who drafted it that it complied with "all the relevant laws." (2007 Garner Dep. 82:13–14.) In the intervening years, Defendants have never had another attorney review the contract, and E.L. Garner, Jr. testified that he was not even aware of the existence of the FLSA until approximately January 2007.

The mere fact that E.L. Garner was assured in 1984 or 1985 that the ICA's predecessor complied with "all relevant laws" is insufficient to establish good faith, nor is it relevant that the LPNs have been deemed independent contractors for purposes of seeking unemployment benefits, since the definition of "employee" under the FLSA is likely broader than that used by the Tennessee Department of Labor. As Judge Nixon previously found based upon these same facts, "this complacency and ignorance of law constitutes negligence sufficient to defeat good faith." *Wilson*, 2008 WL 2944661, at *19. Based on the foregoing, Plaintiffs are entitled to judgment as a matter of law on the question of whether Defendants failed to act in good faith; Plaintiffs' motion for summary judgment as to their entitlement to liquidated damages will therefore be granted.

### 2. Whether Defendants Acted "Willfully"

Under 29 U.S.C. § 255(a), a cause of action under the FLSA is barred unless commenced within two years after the accrual date, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." Plaintiffs here argue that Defendants' failure to comply with the FLSA was willful and that the three-year limitations period therefore applies to their claims.

The Court agrees and finds, for the reasons already set forth by Judge Nixon under the identical facts as those presented here, that Defendants acted willfully and that the three-year limitations period established under 29 U.S.C. § 255(a) applies. As stated in the *Wilson* opinion:

> In 2005, Defendants entered into an agreement with HHA Friendship Home Health ("Friendship") to purchase 50% of Friendship and assume responsibility for payment of Friendship's nurses. At the same time, Friendship was being sued by the Department of Labor ("DOL") for violation of the FLSA for failure to pay overtime to its nurses. As a result of that suit, Friendship entered into a settlement and awarded backpay to its nurses. Just before finalizing a transaction with Friendship, Mr. Garner asked the CEO of Friendship, Theo Egbujor ("Mr. Egbujor"), "if I get ready to exercise and if I'm able to exercise the option to buy 50 percent of your company, Friendship, there are no liens or any lawsuits out there, are there?" . . . Mr. Egbujor responded that Friendship had indeed been sued by the DOL and that the matter was still pending. However, Mr. Egbujor assured Mr. Garner that the suit would be resolved by the end of the year and that Mr. Garner had nothing to worry about. Mr. Garner was told nothing further and

asked no further questions.

*Wilson v. Guardian Angel*, 2008 WL 2944661, at *8. Judge Nixon concluded that this evidence established Defendants' recklessness:

> Defendants were planning to take over the payment of Friendship's nurses, as well as a significant ownership share in the company. Defendants should have inquired what payment practices of Friendship had triggered the suit by the DOL, lest Defendants commit the same mistake or unwittingly assume a portion of Friendship's liability.

*Id.* at *21 (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999).) This Court agrees, and notes particularly that E.L. Garner, Jr. was aware that the issue with the DOL involved a dispute about overtime pay but did not, according to his own testimony, inquire further. Summary judgment will therefore be granted in favor of the Plaintiffs as to the application of the three-year statute of limitations.

## IV.    CONCLUSION

For the reasons set forth herein, Plaintiffs' first motion for partial summary judgment (Doc. No. 141) will be denied in part and granted in part. Specifically, Plaintiffs are entitled to judgment in their favor as a matter of law on the issue of whether they are "employees" rather than independent contractors for purposes of the FLSA. Further, Plaintiffs are entitled to judgment in their favor as a matter of law as to the joint and several liability of the Guardian Angel entities and On-Call entities, as well as E.L. Garner, Jr. Plaintiffs' motion for summary judgment will be denied, however, as to Quality Care Home Health's and Lee Garner, III's liability.

Plaintiffs' second motion for partial summary judgment (Doc. No. 182) will be granted in full. There are no material issues of disputed fact and Plaintiffs are entitled to judgment as a matter of law on the questions of whether Defendants failed to act in good faith and, further, acted willfully in violating the applicable provisions of the FLSA.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge